Circuit Court, District of Columbia. May Term, 1835.

SLAVERY — ILLEGAL BRINGING INTO STATE — SUIT FOR FREEDOM—REVERSIONER'S INTEREST.

1. An importation of slaves by a person who has only a life estate in them is an importation within the Maryland act of 1796, c. 67, § 1 [1 Dor. Md. Laws, 1796, p. 334], and the consent of the reversioner to the importation is not necessary to give freedom to the slaves thus imported.

2. The question of the intent with which the importation is made is for the jury.

Petition for freedom by Negro Charles Taylor, and others; six cases; removed from Washington to Alexandria county for a fair trial.

The petitioners claim freedom by reason of their importation from Virginia into the county of Washington "to reside," contrary to the Maryland act of 1796, c. 67, § 1.

Mr. Taylor, for the defendant [Ariss Buckner], having offered evidence that some of the petitioners, namely, Fanny and her children, were the property of the defendant for the life of his wife only, prayed the court to instruct the jury, that the importation of those petitioners by the defendant could not give them any right to freedom under the first section of the Maryland act of 1796, c. 67, and cited Negro Sally v. Ball, 1 Wheat. [14 U. S.] 1, and the Virginia law of 1819, §§ 48, 49 (2 Rev. Code, 431).

But THE COURT (MORSELL, Circuit Judge, not having heard the argument, gave no opinion) refused to give the instruction.

Mr. Taylor then prayed the court to instruct the jury that such importation, without the consent of the reversioners, could not give those petitioners a right to freedom under the first section of the Maryland act of 1796, c. 67, which THE COURT still refused to give, notwithstanding the case of Negro Sally v. Ball, 1 Wheat. [14 U. S.] 5, considering the words, "since it is the property of the person importing the slave which is forfeited," as dictum only; that point not being necessary to the decision of that cause, the slave in that case not having been brought in to reside or for sale, but only for a year's service, and having been, in the course of the year, carried back to Virginia.

Mr. Key, for petitioners, contended that the hiring out in Washington of the slave of a non-resident, for more than a year, is evidence that the bringing in was "to reside," contrary to the first section; and that it had been so decided by this court.

Mr. Jones denied it; and appealed to the court.

THE COURT (nem. con.) said that they did not recollect any such decision; but that the question was always left open to the jury, as to the intent with which the importation was made.

## Case No. 13,783.

TAYLOR et al. v. BURLINGTON, C. R. & M. RY. CO.

[4 Dill. 570; 4 Law & Eq. Rep. 74, 101; 11 West. Jur. 337; 9 Chi. Leg. News, 329; 4 Cent. Law J. 535, 536.] [1]

Circuit Court, D. Iowa. May Term, 1877.

MECHANIC'S LIEN — RAILWAYS — RELATIVE RIGHTS AND PRIORITIES OF MECHANICS AND MORT-GAGEES UNDER THE LEGISLATION OF IOWA.

1. Under the legislation of Iowa, mechanics and material-men are entitled to a lien on railways for their work and labor.

2. Such lien dates from the commencement of the building of the railway, and is prior to a mortgage executed pending the building of the railway, and before the particular work was done or materials furnished for which the lien is claimed.

[Cited in James River Lumber Co. v. Danner (N. D.) 57 N. W. 345; Thomas v. Mowers, 27 Kan. 268.]

3. Under the legislation of Iowa, the relative rights and priorities of mechanics and mortgagees considered and determined.

4. Within what time mechanics' liens must be filed and enforced.

The plaintiffs in the main suit, [Frederick] Taylor et al., are trustees in railway mortgages on the Burlington, Cedar Rapids & Minnesota Railway Company. These mortgages include all existing and future to be acquired property of the company, including rolling stock, and rents, and income, and were executed and recorded before the work was done and the materials furnished by the intervening petitioners. Prior to the execution of the mortgages the railway was projected and partially surveyed from Burlington to Plymouth (in the north part of the state), and about $155,000 expended in grading and preparing the road-bed along different parts of the line. The Muscatine Division was purchased from another company, which had graded and tied about twenty-five miles thereof; after the purchase thereof by the Burlington, Cedar Rapids & Minnesota Railway Company, to-wit, July, 1872, the latter company executed the mortgage thereon, which was duly recorded. The main line was built in three divisions—the last being completed December 1, 1872—but all are and were designed to be one railroad, and all are included in the mortgage to plaintiffs, which was recorded after work was begun on the second division.

Wells, French & Co., pending the foreclosure suit against the railway company, came into court and filed a petition setting up their

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. John F. Dillon. Circuit Judge, and here reprinted by permission. 4 Law & Eq. Rep. 74, 101, contains only a partial report.]

claims and asking an order on the receiver to pay them. This petition was amended, asking to establish a mechanic's lien on the railroad for one span of a truss bridge over Mud creek, on the main line; for two spans of a truss bridge over the Iowa river, on the Muscatine Division, and for forty coal cars. The dates and amounts of their claims are as follows:

1. For one span Howe truss bridge furnished for main line, over Mud creek, between Vinton and Cedar Rapids, February 24, 1874, amount due........... $ 1,404 50
   With ten per cent. interest from April 12, 1874.
2. For two spans Howe truss bridge over Iowa river, Muscatine Division, delivered December, 1873, balance due December 4, 1873 ...................... 1,313 85
   With ten per cent. interest from that date.
3. For balance due on forty coal cars sold and delivered August 14, 1873, after payments and settlements up to November 1, 1874 ...................... 9,397 83
   With interest at seven per cent. from that date.
4. On April 1, 1875, all the above were thrown into one statement, on which, with added interest, there was then due to Wells, French & Co.............. 13,108 04
5. On April 12, 1875, the railway company paid.. $ 500
   On May 1, 1875, same paid   1000    1,500 00

Leaving general balance due... $11,608 04

The last $1,500 was applied on interest due and balance on first note for cars.

In respect to these Howe truss bridges, the parties agreed as follows: That the span of Howe truss bridge of seventy-five feet, which was sold in 1874, was sold in lumber and iron in Chicago, and delivered there in separate pieces and put up across Mud creek, and iron put over it by the railroad company on the main line, on the division between Cedar Rapids and Waterloo, after the main line was finished and in operation, and was put up to supply the place of a bridge at the same place which was broken down or carried away by high water. That the two spans of Howe truss bridge furnished in 1873, for the Iowa river, on the Muscatine Division, were sold and delivered at the date named, in 1873, at Chicago, and placed in place by the railroad company, and iron and ties put over them by the railroad company. That the said Burlington, Cedar Rapids & Minnesota Railway Company purchased the Muscatine Division when it was graded and tied for about twenty-five miles, of another railroad company, and placed the mortgage on that division, and recorded it, before the said Burlington, Cedar Rapids & Minnesota Railway Company commenced any work on the division, but after it was graded by the other company. The date of delivery of the span over Mud creek, was on the 24th day of February, 1874. The date of the delivery

of the two spans over the Iowa river, on the Muscatine Division, was on the 26th day of December, 1873. The contract to furnish forty coal cars is in writing, dated August 3, 1873, and the cars were sold and delivered without any condition, and this contract was made and the cars delivered long after the main line of the railroad was completed. On November 9, 1875, Wells, French & Co. filed statements for liens in Benton and Johnson counties for the bridges, and on November 18, filed statement in Linn county for balance due on cars. On December 14, 1875, Wells, French & Co. filed amended petition to enforce and establish these liens, and claimed and prayed a lien on the whole road for each amount. December 28, 1875, the trustees answered the petition, setting up the statute of limitations against the lien, and averring that Wells, French & Co. were not entitled to a lien as against the mortgage. The question is, whether Wells, French & Co. are entitled to a mechanic's lien for all or any part of these claims, and if so, whether it is prior or subsequent to the lien of the mortgages. The provisions of the statute upon which this question depends, are mainly sections 2130, 2137, 2139–2141, 2143, 2510, and 2539 of the Code of Iowa of 1873, which, so far as material, are referred to in the opinion of the court.

Hubbard & Deacon, for Wells, French & Co.

James Grant, for railway mortgage trustees.

[Before DILLON, Circuit Judge, and LOVE, District Judge.]

DILLON, Circuit Judge. In the various railway foreclosure cases in this court, there are probably forty intervening petitions filed seeking to establish, on behalf of the claimants, mechanic's lien on the property covered by the railway mortgages. The trustees, in these mortgages, resist the right to any lien whatever, in many cases, and particularly resist the establishment of a mechanic's lien in any case where the labor was done, or the materials were furnished, after the recording of the mortgage, which shall have priority over the mortgage. There are also questions as to the lien for repairs after the road has been completed, as distinguished from the right to a lien for original construction; and questions, also, as to limitation of the lien of the mechanic.

The most important of these questions are presented in the case of Wells, French & Co., and that has, therefore, been selected as the one in which to state the conclusions at which the court has arrived. In many respects nothing is more unlike than the erection of an ordinary building and the construction and equipment of a line of railway, and much of the difficulty in construing the legislation of the state has arisen out of the grouping of the two by the leg-

islature and making an uniform or single provision for both. The duty of the court is to feel its way to the legislative intent and give that intent effect as far as it may. Wherever the statute has been construed by the supreme court of the state, that construction will be accepted as a rule of decision by this court. While we have considered every decision of the state supreme court which bears upon the questions before us, and also the full and exhaustive discussions of counsel, it is not proposed to go into an elaborate exposition of the different provisions of the statute, but mainly to state the results to which our examination has brought us.

The mechanic's lien statute (Code, §§ 2130, 2132) extends, inter alia, to all persons "who construct or repair any work of internal improvement," including railways, and gives a lien "for labor done, or materials, machinery, or fixtures furnished," upon "such building, erection, or improvement, and upon the land belonging to the owner, on which the same is situated." Section 2130.

Another section provides for the filing of the claim with the county clerk within ninety days after the work is done, and declares what shall be the effect of a failure to file. Section 2137.

Section 2139 first provides for the priority of mechanics' liens as among themselves, making the same depend upon the order of filing, and then proceeds to exact that such liens "shall be preferred to all other liens and incumbrances which may be attached to or upon such building, erection, or other improvement, and to the land on which the same is situated, or either of them, made subsequent to the commencement of said building, erection, or improvement." The lien extends to the entire land to the extent of the interest of the person for whom the mechanic did the work or furnished materials, and to a leasehold interest, as to which the provision is that the forfeiture of the lease shall not impair the mechanic's lien as to the buildings, but the same may be sold to satisfy the lien and be moved off within thirty days after the sale. Section 2140.

Section 2141 provides for still another case in these words: "The lien for the things aforesaid, or work, shall attach to the buildings, erection, or improvements for which they were furnished or done, in preference to any prior lien, or incumbrance, or mortgage upon the land upon which the same is erected or put, and any person enforcing such lien, may have such building, erection, or other improvement sold under execution, and the purchaser may remove the same within a reasonable time thereafter." The suit to enforce a mechanic's lien must be in equity. Section 2510.

We hold as follows:

1. Section 2139 contemplates and provides for a case where, at the time of the commencement of the building or railway, there is no recorded lien or incumbrance thereon, and where such lien or incumbrance is created subsequent to the commencement of the building or railway; in which case the mechanic has a lien which relates back to the commencement of the building or railway, although the particular work of that mechanic was done, or his materials were furnished, after a mortgage was recorded, or lien created.

As to an ordinary building, the proposition just stated admits of no doubt; indeed, it has been expressly decided to be correct by the supreme court of the United States, in respect of an enactment copied from the Iowa statute. Davis v. Bisland, 18 Wall. [85 U. S.] 659.

As to the application of this principle to railways, the decision of the supreme court of Iowa is conclusive. Neilson v. Iowa Eastern R. Co. (Sept. term, 1876) 44 Iowa, 71.

Construing section 1853 (the same as section 2139 of the Code of 1873), it was decided, in the case last cited, that the lien of the mechanic dates from the commencement of the railway, treating it as an entirety, and has priority over a mortgage executed after the work of constructing some portion of the railway has been commenced, and before the particular work was done, or materials furnished, for which the mechanic's lien is claimed.

2. Section 2141 makes provision for a still different case. This section contemplates and provides for a case where there is a mortgage, lien, or incumbrance upon the land prior to the time when the owner commences "a building, erection, or other improvement thereon." What, then, are the relative rights of such prior incumbrancers and the mechanic? This is plainly determined by the section itself. As to the land, the mortgage is declared to retain its priority; but as to the buildings, erections, or improvements put upon the land subsequent to the mortgage, the mechanic has priority over the mortgage—may enforce his lien accordingly, and have the building, erection, or improvement sold on execution, and remove the same within a reasonable time.

The mechanic has, in such a case, the same right as against the mortgagee that he has as against the lessor under the preceding section.

This view, to the extent just stated, is in accordance with the decision of the supreme court of the state in Getchell v. Allen, 34 Iowa, 559, which case, so far as it relates to an "independent erection on the land," is undoubtedly correct, and is approved, at least to this extent, by the same court in the subsequent case of Neilson v. Iowa Eastern R. Co., supra.

3. But suppose the prior mortgage attaches not only to land, but to a completed house, or other erection or improvement thereon, and the house or other improvement is re-

paired by the mechanic, at the instance of the owner—what, then, are the relative rights of the mortgagee and the mechanic? This was the question which gave so much trouble to the state supreme court, as will be seen by reference to Getchell v. Allen, and the first opinion of that court in the Neilson Case. Under section 2130, undoubtedly the mechanic has a lien for repairs to a building erected and completed before the repairs were begun. That section uses the word "repairs." and reparations by a mechanic are within the remedial purpose of the legislature. But when does such a lien attach, and how is it to be enforced? As against the owner, the lien attaches from the time the repairs are begun. This is plain enough, and just. But when does this lien attach as against a prior mortgagee of land and building? The answer is, at the same time it attaches as against the owner. The result is that repairs on a previously completed building or railway on which a mortgage rested prior to the commencement of such repairs, do not give a lien which will override the lien of the mortgage. The legislature has not authorized the owner of a building or railway, on which such owner has given a mortgage, to improve the mortgage out of existence by making repairs ad libitum, and furnishing the owner the necessary credit therefor, by giving the mechanic and material-man a lien paramount to the mortgage. Such a view has neither law, justice, equity, nor public policy to recommend it. This conclusion accords with the opinion of the supreme court on this point in one branch of the case of Getchell v. Allen. To such a case section 2141 of the Code does not apply —that section only applying to cases where the lien of the mechanic is sought with respect to improvements which were not on the land when the prior mortgage was taken, and on the security of which the mortgage did not rely.

Suppose a lessee improves the house of the lessor, it would hardly be contended, under section 2140, that the mechanic could sell the whole house under his lien, and move it away. Nor, under section 2141, can he do this with respect to a building covered by a prior lien. The provisions and purpose of the two sections, in this regard, are the same.

Where there is a prior lien on the building or railway, these once having been completed, if a mechanic subsequently does work, or furnishes materials, he has a lien, but a lien subordinate to the mortgage, and which must be enforced as such, and·it is accompanied with no right of removal. This view accords with the language of the statute and with its policy, and leads to just results. Any other view leads to confusion and injustice.

Applying these principles to the case of Wells, French & Co., the result is this:

1. As respects the bridge furnished in 1874, after the execution of plaintiffs' mortgage, and after the road had been completed, to replace a bridge which had been carried away, any lien which it would be possible to get therefor would be subsequent to the mortgage.

2. The same principle applies to the coal cars furnished in 1873, even if it were conceded that there was a lien upon a railroad for cars furnished to use thereon, which is at least doubtful. New England Car Spring Co. v. Baltimore & O. R. Co., 11 Md. 81.

3. As to the two spans of bridge furnished in December, 1873, for the original construction of the Muscatine Division, the petitioners are entitled to a lien, if they have complied with the provisions of the statute in respect to filing their claim and bringing suit to enforce it. Code, §§ 2137. 2138, 2529. As these were delivered December 26, 1873, the case falls within the Code of 1873, and not the Revision of 1860.

Under the Code of 1873 (section 2137), the mechanic may file his lien within ninety days, etc., "but a failure to file the same within the time aforesaid shall not defeat the lien except against purchasers or incumbrancers in good faith without notice, whose rights accrued after the ninety days and before any claim for the lien was filed."

"Actions to enforce a mechanic's lien must be brought within two years from the time of filing the statement in the clerk's office." Section 2529. The two bridge spans in question were delivered December 26, 1873; statement for lien filed November 9, 1875, and the petition filed to enforce and establish the lien December 14, 1875, which was within the two years. As against the railway company, the failure to file the statement for a lien does not defeat the lien, and there are no incumbrancers or purchasers whose rights accrued after the ninety days and before the same was filed. The supposed defect in the statement, if not cured by the stipulation, is not of such a nature as to defeat the lien. For the amount due for these two spans, $1,313.85, with interest. the petitioners are entitled to a lien prior to the mortgage. Decree accordingly.

In Re Intervening Petition of the Union Rolling Mill Company.

[Before DILLON, Circuit Judge, and LOVE, District Judge.]

DILLON, Circuit Judge. At a period distinctly after the railroad was finished, and had long been operated, the rolling mill company "furnished to the railway company (in April, June, August, and December, 1874), iron and steel rails for the repair of their lines of railway; which rails were placed in their said railway, and have ever since been and are now used as part of the track thereof." The mortgages were recorded years before.

This petition raises the single question

whether a lien exists, under the mechanic's lien statute, for repairs to a railway previously completed and in operation, which is superior to the lien of a mortgage made and recorded before the repairs but subsequent to the original commencement of the work of constructing the railway.

This question is covered by the principles laid down in the case of Wells, French & Co. The petitioners have a lien, but it is subsequent to the mortgage. The result would have been different if the rails had been furnished for the original or first construction of the road.

## In the Matter of the Intervening Petition of the United States Wind Engine & Pump Company.

The material facts are, in brief, as follows: 1. Between April 14, 1870, and March 5, 1875, intervenor sold and delivered to the Burlington, Cedar Rapids & Minnesota Railway Company, wind engines and fixtures to the value of $11,137.17, of which has been paid $7,167.43, leaving balance due $3,969.-74—$2,626.02 bearing interest at ten per cent, and $1,343.72 bearing interest at six per cent—as shown by agreed statement, and from dates there given. 2. They were all sold under a verbal agreement "that the title to the engines should not vest in the railway company till paid for." It was, of course, not recorded. 3. December 6, 1875, petitioner (United States Wind Engine & Pump Company) filed its petition asking payment from the receiver for the balance due, or the right to remove the engines, etc., or other relief; and on same day the trustees in the railway mortgages filed answer averring that the agreement for title was not good, because not recorded, as required by act of 1872 (Code, § 1922), and averring title in the railway company, and through it were subject to the mortgage, etc.; and on same day a general replication was filed. 4. April 5, 1876. intervenor amended, by leave of the court, and claimed mechanic's lien on entire road, etc., under statements for liens filed in all counties where engines were situated on March 27 and 28, 1876. May 1, 1876, the trustees answered, claiming priority for their mortgages. denying intervenor's right to a lien, because not filed within one year after the last engines were sold, and because they were no part of the construction or repairs of the road. May 6, 1876, replication filed. The amount due petitioner was not disputed. The parties stipulated as to the facts.

Hubbard & Deacon, for petitioner.

James Grant, for trustees in the railway mortgages.

[Before DILLON, Circuit Judge, and LOVE, District Judge.]

DILLON, Circuit Judge. The petitioner, on December 6, 1875, filed its petition to re-cover out of the fund in court, or have returned to them certain wind-mills, and articles supplied to repair the same furnished on and since November 30, 1873. The petition alleges that pumps and engines had been furnished before that, but all that were furnished prior to November 15, 1873, had been paid for. It alleges that said mills and fixtures were furnished to said railway company by virtue of a "verbal agreement that they were to be paid for in monthly installments, and the wind company were not to relinquish their title until they were paid; and it was expressly understood, in case of default the plaintiff should have the right to take and remove the mills and fixtures" (see the first bill). The defendant answered, denying the agreement as to title, and averring that said contract was not in writing, acknowledged and recorded, and could not be enforced. Upon the coming in of this answer, the plaintiff, on the 21st of March, 1876, filed a mechanic's lien claim, and amended its bill, claiming alternatively a mechanic's lien, not only for the wind-mills and pumps, but for the supplies and repairs of the same. The right to a mechanic's lien is denied by an answer filed to the amended petition. The material stipulation in the agreed facts is as follows: "An agreement or understanding existed between the United States Wind Engine and Pump Company and said railway company that the title to all the property delivered should not vest in the railway company until paid for; but said agreement was not in writing, and was never recorded."

The petitioner asks alternative relief.

1. They claim that effect should be given to the verbal agreement as to the title remaining in the petitioners until payment for the engines was made. The answer of the trustees is that the agreement not being recorded, it cannot avail as against them without notice of it. All the engines delivered before November, 1873, have been paid for. It is those delivered after that date that are in controversy. If regarded as realty, the recording statute would give the priority to the mortgagee without notice. If personal property, the act of 1872 (Code, § 1922) declares the condition as to retaining title invalid against creditors without notice, unless the investment be in writing and recorded. It was neither in writing nor recorded. Nor is it shown that the trustees in the railway mortgage had notice thereof. It is not stated in the stipulation when the agreement as to title remaining in the seller was made, but as engines were sold from time to time. beginning in April, 1870, it is argued that the agreement must have been made prior to that time, and hence it was a continuing agreement, antedating the statute, and hence, under our decision in the Haskell & B. Car Co. Case [unreported], it need not be recorded. But

in that case there was an agreement in writing prior to the statute, and specifically relating to the cars in dispute. In this case it is not shown that, prior to the statute of 1872 (Code, § 1922), the parties made a contract which bound the petitioners to furnish and the railway company to receive the engines now in dispute, viz., those delivered after November, 1873. The statute (section 1922), therefore, applies, and must have effect if the trustees in the railway mortgage are "creditors" of the railway company within the meaning of the section.

The railway mortgages, under which the trustees claim, were made and recorded prior to the delivery of the engines here in question. The statute of the state authorizes railway companies not only to mortgage their existing property, "but also property, both real and personal, which may thereafter be acquired, and shall be as valid and effectual for that purpose as if the property was in possession at the time of the execution thereof" (Code, § 1284); and the recording thereof "shall be notice to all the world of the rights of all parties under the same" (Id. § 1285).

The railway mortgages were executed and recorded prior to the delivery of the engines not paid for, and cover all after-acquired property pertaining to the railway. These engines are on the right of way, are essential to the use of the railway, and are part of it. They fall within the property embraced in the mortgage. But it is claimed that, as to after-acquired property, the mortgagee must take it cum onere (U. S. v. New Orleans, 12 Wall. [79 U. S.] 362); and as the stipulation as to title being retained by the seller is good between the parties, it is likewise good as to the mortgagee or trustees. Treating these engines as in the nature of personalty or removable fixtures, I am inclined to think, aside from the requirements of section 1922 of the Code, that this position would be sound. But the mortgagees are creditors of the railway company, and such verbal unrecorded agreements are declared to be invalid against "any creditor" (prior or subsequent) without notice, and are probably ineffectual as against the trustees in the railway mortgage in actual possession under the mortgage.

2. As to the claim for a mechanic's lien, section 2129 of the Code enacts that "no person shall be entitled to a mechanic's lien who takes collateral security on the same contract."

It is admitted that, for the purpose of securing payment, the vendors made a contract to retain the title. This would be good between the parties, and would be good against creditors if it had been reduced to writing, acknowledged and recorded.

A seller who undertakes to secure himself in this specific way, showing that he does not rely upon the lien given by the statute to the mechanic or material-man— a way inconsistent in its nature with a right to a lien under the statute—takes "collateral security" within the meaning of the statute, and hence is not entitled to a mechanic's lien. Petition dismissed.